**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**MICHAEL BROWN,**

　　　　　**Plaintiff,**

　　　　　　　　　　　　　　　　　**Civil Action 2:21-cv-5146**
　　**v.**　　　　　　　　　　　　**Chief Judge Marbley**
　　　　　　　　　　　　　　　　　**Magistrate Judge Kimberly A. Jolson**

**WILLIAM COOL et al.,**

　　　　　**Defendants.**

**REPORT AND RECOMMENDATION**

This matter is before the Court on cross-motions for summary judgment. For the following

reasons, the Court **RECOMMENDS DENYING** Plaintiff Michael Brown's Motion for Summary

Judgment (Doc. 54) and **RECOMMENDS GRANTING in part and DENYING in part**

Defendants William Cool, D. Farmer, Dane Osbourne, and Travis Raypool's Motion for Summary

Judgment (Doc. 66).

**I.　　BACKGROUND**

Plaintiff Michael Brown, currently incarcerated and proceeding *pro se*, brought this action

under 42 U.S.C. § 1983 against Ross Correctional Institution ("RCI") Warden Cool and RCI

Correctional Officers Farmer, Osbourne, and Raypool. (Doc. 3). Construing his complaint

liberally, Plaintiff's colorable claims allege that Defendants violated his rights under the First and

Eighth Amendments. (*Id.*).

Plaintiff's claims stem from alleged interactions with Defendants and other prison staff that

span almost ten months, beginning on November 5, 2020. (Doc. 3-1 at 2). While going to dinner

that evening, Plaintiff observed Defendant Raypool and another incarcerated person "having

words," and Plaintiff "took it upon [himself] to 'keep the peace'" by pointing out that it was

"pointless to argue with [Raypool]." (*Id.*). Raypool purportedly then placed Plaintiff on the fence, patted him down, and sent him back to his unit without a meal. (*Id.*). The next day, Plaintiff was singing as he left his cell to go to lunch when Raypool told him to "shut up." (*Id.*). Plaintiff told Raypool that he "didn't say anything to you[,]" and Raypool responded that Plaintiff was now on lockdown and "[wouldn't] be eating." (*Id.*). Raypool then escorted Plaintiff back to his cell. (*Id.*).

About a month later, on December 11, Plaintiff asserts that Raypool "smacked me and then threw closed fists at my face and proceeded to assault me while I was defenseless" in a captain's office when Plaintiff was making a use of force statement for a different incident. (*Id*. at 3). Plaintiff says he suffered a minor concussion as a result. (*Id.*).

A few months later, on April 16, 2021, Plaintiff claims that Defendant Osbourne went "beyond his duties to harass" Plaintiff and his cellmate. (*Id.*). Plaintiff says that three days later, while he was in an office to have a conduct ticket read to him, Osbourne was "making snide remarks." (*Id.*). Plaintiff "commented back" and was subsequently escorted to his cell by Osbourne and another officer. (*Id.* at 3–4). Plaintiff claims that while he was waiting for his cell door to open, Osbourne spun him around and slammed him on the ground. (*Id.* at 4). It is undisputed that Plaintiff needed and received seven stiches in his right ear. *(Id.*).

On July 7 during a ticket hearing, a staff member told Plaintiff to face the wall. (*Id.* at 5). Plaintiff claims that as he was turning to face the wall, Defendant Farmer, who was also in the room, ordered: "Don't pull away from me." (*Id.*). Plaintiff replied that he was trying to face the wall when Farmer slammed him against the wall and then on the ground, banging Plaintiff's head both times. (*Id.*). Farmer then purportedly punched Plaintiff in his face, choked him, and crushed him by laying on him. (*Id.*).

Plaintiff alleges that, between June and September, multiple corrections officers told him he was going to be "beat" after implying that he would be moved to Southern Ohio Correctional Facility ("SOCF"). (*Id.* at 4–6). Plaintiff says that after one of the conversations, a corrections officer slammed "the steel door [to Plaintiff's cell] on [his] body causing [him] to fall." (*Id.* at 4). Plaintiff suffered a bruise on his shoulder but claims "medical didn't even touch [him]." (*Id.*). Plaintiff sought mental health services during this time because he says he feared for his life and was suicidal. (*Id.*). Plaintiff claims he was told by the mental health personnel, "you're not suicidal" and to "get your beating." (*Id.*). Plaintiff alleges that he "made an attempt on [his life]" on August 17 after Defendant Farmer told him to kill himself because Farmer's buddies would kill him anyway when Plaintiff was transferred to SOCF. (*Id.* at 6). Afterwards, another corrections officer purportedly threatened him with more bodily harm. (*Id*. at 6).

Plaintiff also claims that various non-defendant corrections officers harmed him by falsifying documents pertinent to his complaints or hearings, denying him notary services, and hindering him from making complaints. (*Id*. at 5–7). Plaintiff says he notified his unit managers and the unit manager chief about all of these alleged wrongs. (*Id.* at 6). He also says he used the inmate informal complaint system to notify RCI's former Warden and current Warden, Defendant Cool, about his treatment. (*Id*. at 7). When that failed, he filed this lawsuit. (*See generally* Doc. 3).

Plaintiff and Defendants have moved for summary judgment, and the Motions are ready for consideration. (Docs. 54, 58, 61, 66, 67, 72).

3

## II.    STANDARD

Summary judgment is granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriately entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When a defendant shows there is insufficient evidence to support any element of the plaintiff's claim and moves for summary judgment, the burden shifts to the plaintiff to demonstrate a genuine issue for trial on which a reasonable jury could return a verdict in its favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).  Evidence is viewed in the light most favorable to the nonmoving party, meaning that "any direct evidence offered by the [nonmovant] in response to a summary judgment motion must be accepted as true."  *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (citing *Liberty Lobby*, 477 U.S. at 251–52; *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)).  Ultimately, the Court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251–52.

## III.    DISCUSSION

Plaintiff and Defendants have filed cross-motions for summary judgment.  (Docs. 54, 66). The Court addresses each in turn.

### A.  Plaintiff's Motion for Summary Judgment

Plaintiff argues that the Court should grant summary judgment in his favor because the eight "points" he outlines in his Motion "are supported by facts beyond any doubt."  (Doc. 54 at

3). His points include: Defendant Osbourne put himself unnecessarily in Plaintiff's vicinity multiple times, and Plaintiff received seven stiches in his ear because of Osbourne's violent actions; Defendant Raypool denied Plaintiff two meals and assaulted him; Defendant Farmer assaulted Plaintiff then continued to interact with him while a use of force investigation was pending; and Defendant Cool was Plaintiff's legal guardian during this time yet did not protect him from RCI staff. (*Id*. at 1–3). Yet, Plaintiff does not provide evidence for these declarations supporting his Motion nor does he supply other evidence to satisfy each of the elements of his claims. In short, Plaintiff has not shown, viewing all facts and evidence in favor of Defendants, that a reasonable jury could not return a verdict for Defendants. Thus, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Doc. 54) be **DENIED**.

### B. Defendant's Motion for Summary Judgment

Construing Plaintiff's complaint liberally, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), he alleges multiple Eighth Amendment claims and a First Amendment claim. (Doc. 3). Particularly, Plaintiff claims that Defendants violated his civil rights by: (1) subjecting him to excessive force on three occasions; (2) depriving him meals; (3) being deliberately indifferent to and failing to protect him from harm; and (4) retaliating against him for filing grievances. The Undersigned considers each claim in turn, as well as Defendants' qualified immunity defense.

#### 1. Eighth Amendment – Excessive Force

Plaintiff alleges that Defendants used excessive force on three separate occasions. (Doc. 3-1 at 3–5). Defendants respond that none of these instances rise to the level of a constitutional violation. (Doc. 66).

"The Eighth Amendment prohibition on cruel and unusual punishment protects prisoners from the unnecessary and wanton infliction of pain." *Rafferty v. Trumbull Cty., Ohio*, 915 F.3d

5

1087, 1093 (6th Cir. 2019) (quoting *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)). "[T]he Supreme Court set forth the standard for analyzing excessive force claims under the Eighth Amendment: 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)). "To make out a claim under the Eighth Amendment, the prisoner must satisfy both an objective and a subjective component." *Rafferty*, 915 F.3d at 1094 (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011)).

"The subjective component focuses on the state of mind of the prison officials." *Williams*, 631 F.3d at 383. Courts evaluate "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* (quoting *Hudson*, 503 U.S. at 6). In making this inquiry, the Court should consider the need for the use of force, the relationship between that need and the type and amount of the force used, the threat reasonably perceived by the official, the extent of the injury inflicted, and any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). "The objective component requires the pain inflicted to be sufficiently serious." *Rafferty*, 915 F.3d at 1094 (citing *Williams*, 631 F.3d 383). This inquiry is "contextual and responsive to 'contemporary standards of decency.'" *Hudson*, 503 U.S. at 8 (quoting *Estelle*, 429 U.S. at 104). "The seriousness of the injuries [is] not dispositive; as the Supreme Court has held, '[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident.'" *Williams*, 631 F.3d at 383 (quoting *Hudson*, 503 U.S. at 9). But "[t]hat is not to say that every malevolent touch . . . gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9. The Eighth

Amendment does not protect against "*de minimis* uses of physical force[.]" *Rafferty*, 915 F.3d at 1094 (quoting *Hudson*, 503 U.S. at 9–10).

Defendants argue that they are entitled to summary judgment for the claims involving force because Plaintiff cannot satisfy either the objective or the subjective components of an Eighth Amendment excessive force claim. (Doc. 66 at 21–27). Whether a defendant's use of force is excessive is a fact-intensive inquiry. *See Hudson*, 503 U.S. at 7, 112 S.Ct. 995 (discussing factors for courts to consider). Lower courts' decisions demonstrate as much. *See, e.g.*, *Alspaugh v. McConnell*, 643 F.3d 162, 168–69 (6th Cir. 2011) (finding genuine issue of material fact as to whether prison officials applied force maliciously and sadistically to cause harm where parties disputed whether prisoner was resisting when two correctional officers beat him); *Goudlock v. Dana Blankenship*, No. 1:13-CV-1215, 2016 WL 3668008, at *6 (N.D. Ohio July 11, 2016), *aff'd sub nom. Goudlock v. Blankenship*, No. 16-3879, 2017 WL 7116970 (6th Cir. Sept. 12, 2017) (citation and quotations omitted) (collecting cases) ("Even assuming that defendants used some force against plaintiff after he was handcuffed, plaintiff has produced no evidence of a discernible injury. In the absence of any evidence of a discernible injury, plaintiff cannot show that defendants' use of force was more than *de minimis*, and no reasonable jury could conclude based upon the undisputed facts that the pain and suffering inflicted by defendants was sufficiently serious to offend contemporary standards of decency."). The Undersigned has, therefore, carefully reviewed the factual record, including Plaintiff's medical records, available video evidence, and the contemporaneous reports of correctional staff for each of the alleged incidents.

### i.    Defendant Raypool

Plaintiff alleges that Defendant Raypool smacked and punched him in the face with a closed fist on the morning of December 11, 2020.  (Doc. 3-1 at 3).  It is undisputed that two other officers used force on Plaintiff that morning.  (*Id.*) (Doc. 66 at 13) (*See* Doc. 69, Video of 12-11-2020 Use of Force at 8:54–8:55).  But what happened next is contested.  Plaintiff asserts that Raypool told three officers to escort him to a captain's office where Raypool assaulted him.  (Doc. 3-1 at 3).  But Raypool says he was not involved in the incident at all.  (Doc. 66 at 13; Doc. 72 at 2).  In response to Defendants' Motion, Plaintiff has claimed that that the earlier use of force incident did not cause him injury, and the medical report reflecting cheek redness, discussed below, was taken after Raypool's alleged assault.  (Doc. 67 at 2–3; *see* Doc. 70 at 1).

The Court need not resolve the factual dispute.  Even assuming the incident with Raypool occurred, Plaintiff cannot satisfy the objective component part of this claim.  Plaintiff specifically alleges that Defendant Raypool's use of force concussed him.  (Doc. 3-1 at 3).  But medical records show otherwise.  Medical notes made at 9:30 AM indicate that Plaintiff refused to have his vitals taken, but the examiner was able to observe Plaintiff and documented "[r]edness . . . to left cheek, no other injuries[.]" (Doc. 66-2 at 9).  Moreover, medical notes timestamped 3:41 PM, which were made following an unrelated incident wherein Plaintiff was sprayed with pepper spray, documented no evidence of a concussion or any other head injury.  In fact, vitals were taken, Plaintiff was evaluated, and "no injuries" were noted.  (Doc. 66-3 at 4–6).

Put simply, the record shows that Plaintiff suffered no discernible injury that can be attributed to Defendant Raypool's actions, let alone a "sufficiently serious" one. *See Rafferty*, 915 F.3d at 1094; *see also Peterson v. Johnson*, 2011 U.S. Dist. LEXIS 45772, 2011 WL 1627924, at *6 (W.D. Mich. 2011) ("Minor injuries such as bruises and swelling are generally insufficient to

support a claim under the Eighth Amendment's Cruel and Unusual Punishments Clause.") (citations omitted); *Bullocks v. Hale*, 478 F. Supp. 3d 639, 648 (S.D. Ohio 2020) ("[Minor swelling and bruising], and more importantly the force required to create it, certainly does not as a general matter offend traditional standards of decency."), *aff'd*, No. 20-3428, 2021 WL 1578198 (6th Cir. Mar. 1, 2021). The record contradicts Plaintiff's allegations; no rational trier of fact could conclude that Defendant Raypool used excessive force as alleged; and summary judgment is appropriate as to this claim.

### ii.     Defendant Osbourne

Plaintiff alleges that on April 19, 2021, Defendant Osbourne slammed him to the ground when he was trying to move out of the way so Osbourne could open his cell door. (Doc. 3-1 at 4). Defendants respond that the force was the minimal amount necessary to control Plaintiff, who was actively resisting an escort and was not trying to move out of the way but rather trying to push Osbourne. (Doc. 66 at 14). In a witness statement following the incident, Plaintiff denied that he was resisting the escort. (Doc. 66-4 at 15).

Because the incident was recorded, the Court need not take either side's word for it. Security footage of the area shows Plaintiff being escorted by two officers to a cell. (Doc. 69, Video of 4-19-2021 Use of Force at 12:26). Initially, Plaintiff appears to be dragging his feet and holding his body stiffly to make it more difficult to move him. (*Id.*). Next, as the officers try to open the cell, Plaintiff can be seen pushing into the officer on his right. (*Id.* at 12:26–12:27). That officer then forcibly spins Plaintiff around and pushes him to the ground on his stomach. (*Id.*). Plaintiff appears to hit his face and head on the ground as he falls. (*Id.*). The officers then quickly move Plaintiff to his feet. (*Id.*).

9

A use of force investigation submitted by Defendants supports these observations, adds that Plaintiff was being verbally argumentative during the interaction, and confirms that Osbourne was the officer in question. (Doc. 66-4 at 1–2). After the incident, medical examination records showed that Plaintiff's "[r]ight ear scaphoid fossa has a 0.75 cm tear and helis has a 2.5cm abrasion noted with active bleeding." (Doc. 66-4 at 24). At that time, Plaintiff was given first aid, dressing supplies, and instructions for self-care of the ear. (*Id.*). Plaintiff returned to medical the following day when the ear would not stop bleeding and received seven sutures to close the wound. (Doc. 66-5 at 3).

An evaluation of the record reveals that Plaintiff has failed to demonstrate the subjective component of an Eighth Amendment excessive force claim for this incident. "[P]rison officials may use appropriate force to regain control of an aggressive inmate." *Cordell v. McKinney*, 759 F.3d 573, 581 (6th Cir. 2014). Video evidence shows that Plaintiff was resisting his escort to some degree, that he pushed into Osbourne with his shoulder, that the force Osbourne applied was in direct response to the push, and that Osbourne almost immediately got Plaintiff up off the ground and back onto his feet, without further force. (Doc. 69, Video of 4-19-2021 Use of Force). These circumstances, taken together, show that Osbourne used the reasonable amount of force necessary to maintain discipline. *See Cordell*, 759 F.3d at 581–82 (finding no genuine dispute of fact that a deputy sheriff had a reasonable basis for using some force against an inmate who attempted to turn towards him and face him during an escort).

Given this record, the Undersigned finds that no rational trier of fact could conclude that Osbourne maliciously and sadistically used force to cause Plaintiff harm. Defendant Osbourne, therefore, is entitled to summary judgment as to this claim.

### iii. Defendant Farmer

Plaintiff alleges that Defendant Farmer used unconstitutionally excessive force against him on July 7, 2021. (Doc. 3-1 at 5). Plaintiff says this occurred after he was instructed to face the wall during a disciplinary hearing and, as he was attempting to do so, Farmer slammed him against the wall and then to the ground. (*Id.* at 4–5). Plaintiff alleges that once he was on the ground, Farmer punched his face and head, choked him, and crushed him by laying on top of him. (*Id.* at 5). Plaintiff does not allege a specific injury from this incident but elsewhere in his complaint notes he suffered a "busted lip." (Doc. 3 at 5). And medical records after the incident show that Plaintiff's lip had a .1 millimeter cut and was swollen, but he did not need treatment. (Doc. 66-6 at 66 ("No treatment needed.")).

Defendants submit that Farmer applied the minimal amount of force needed to protect himself and control Plaintiff. (Doc. 66 at 15). In support, they offer Farmer's version of events as documented by an institutional review of the incident. In Farmer's version, instead of facing the wall when instructed, Plaintiff pulled away, necessitating Farmer to place him on the wall. (Doc. 66-6 at 1–2, 12, 37). Once on the wall, Plaintiff "stated 'f*ck you bitch' and [he] cleared his throat as if he were going to spit on [Farmer]." (*Id.* at 1–2, 12). In response, Farmer pushed Plaintiff's head up and away from him before bringing him to the ground and restraining him as others arrived. (*Id.* at 1–2, 12, 37). Farmer denies hitting Plaintiff with closed fists at any time. (*Id.* at 37).

Another officer in the room during the incident said that she saw Plaintiff pull away from Farmer, heard Plaintiff call Farmer a "bitch," and heard Plaintiff yell, but not that she heard Plaintiff clear his throat as though he were going to spit or see Plaintiff attempt to spit on Farmer. (*Id.* at 2, 17, 33). Another clerk in the room said that she saw Plaintiff pull away from Farmer

when Farmer told Plaintiff to face the wall and heard Plaintiff yelling but not that she heard Plaintiff clear his throat as though he was going to spit on Farmer. (*Id.* at 3, 20, 64). Two officers, who were not in the room but could see into the room through a window, also attested that they saw Plaintiff initially pull away from Farmer. (*Id.* at 2–3, 14, 16, 50, 54). Other staff members responding to the situation reported that they did not see Farmer hit Plaintiff with closed fists. (*Id.* at 30, 33, 41, 44, 47, 61, 64).

There is also some video footage. It shows Farmer pushing Plaintiff against the wall with Plaintiff's face to the wall, his back to Farmer, and his hands cuffed behind his back. (Doc. 69, Video of 7-7-2021 Use of Force at 10:31:30). But the camera angle obscures the view of what happened while Farmer held Plaintiff to the wall. (*Id.* at 10:31:31–10:31:38). The footage then shows Farmer bring Plaintiff to the ground with one hand on Plaintiff's neck and one hand behind Plaintiff's back. (*Id.* at 10:31:38). The angle of the video again obscures what occurred after Farmer took Plaintiff down, other than showing multiple officers entering the room. (*Id.* at 10:31:40–10:33:40). The video shows that Plaintiff was on the ground for about two minutes before officers got him up and escorted him out. (*Id.*).

RCI conducted an institutional review of the incident because Farmer used physical force on Plaintiff. (*See* Doc 66-6). The review found that when he brought Plaintiff to the ground, Farmer's hand "slid to [Plaintiff's] throat." (Doc 66-6 at 4). The review continued that "[o]fficers are not trained to take down cuffed inmates in this manner. While it is believed that Officer Farmer did not choke slam the inmate purposely, that does appear to be what occurred." (*Id.*). The review concluded that while force was justified, the type of force used was not appropriate; rather than bringing him to the ground, Farmer should have held Plaintiff in the corner while waiting for assistance. (*Id.*).

Because of the video footage, some facts are certain. First, during the incident, Plaintiff was handcuffed with his hands behind his back. Second, Farmer used force to bring Plaintiff against the wall and then used force to keep him facing the wall. Third, when subsequently taking Plaintiff down to the ground, one of Farmer's hands was on Plaintiff's throat and the other was behind Plaintiff's back. And fourth, Plaintiff was on the ground for approximately two minutes before officers brought him to his feet. (*See* Doc. 69, Video of 7-7-2021 Use of Force).

But the video footage does not show key moments. The footage does not show a view of what happened while Plaintiff was held to the wall. Nor does the video show what happened when Plaintiff was on the ground. And the parties offer opposing narratives. Farmer asserts that when Plaintiff was being held to the wall, he cleared his throat as if he were going to spit on Farmer. (Doc. 66-6 at 1–2, 12). Plaintiff denies this. (Doc. 67 at 5; *see* Doc. 66-6 at 25, 26). More still, Plaintiff asserts that once on the ground, Farmer assaulted him. (*Id.*) Farmer denies this. (Doc. 66-6 at 37). Essentially, then, Plaintiff's claim against Farmer comes down to a credibility determination. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,' when ruling on a motion for summary judgment." *Helphenstine v. Lewis Cty., Ky.*, 60 F.4th 305, 314 (6th Cir. 2023) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

What's more, were a jury to believe Plaintiff's version of events, it could find that Farmer demonstrated both the subjective and objective components of Plaintiff's excessive force claim. Regarding the subjective component, it is unclear from the record if Farmer needed to use additional force—or the type of force he used—when he already had Plaintiff restrained, facing the wall, and in handcuffs. This Circuit and "[n]umerous courts around the country have found

that at times, a guard's use of a choke hold to bring . . . unruly, disruptive, or fleeing prisoners under control is not per se excessive force." *Armer v. Marshall*, No. 5:09-CV-00086-R, 2011 WL 2580359, at *4 (W.D. Ky. June 28, 2011) (citing *Lawson v. Rowland*, No. 91–16767, 1992 WL 203883, at *2–3 (9th Cir. Aug. 20, 1992); *Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir.1990); *Watson v. Hall*, No. 1:07–cv–928, 2008 WL 149133, at *5–6 (E.D. Va. Jan. 8, 2008); *Miles v. Murra*, No. H–05–2831, 2006 WL 456269, at *3–4 (S.D. Tex. Feb 23, 2006)); *Johnson v. Sootsman*, 79 F.4th 608, 618–20 (6th Cir. 2023).

But crediting Plaintiff's version of events, it is unclear that Plaintiff's actions warranted the use of a choke slam. *Cf. Briggs v. Miles*, No. 15-1386, 2017 WL 2174252, at *3 (6th Cir. Mar. 6, 2017) (highlighting that a reasonable jury could find a deputy lacked good faith to place a prisoner in a chokehold to allow another officer to apply leg restraints when the prisoner "was already in a waist chain and handcuffs, had a taser placed on him by another deputy, and was complying with directions . . ." even though the prisoner was "animated and angry"). And, even if Plaintiff had pulled away from Farmer before he was against the wall, Plaintiff claims the force continued after he was restrained, facing the wall, and handcuffed.

Additionally, Defendant Farmer alone stated that Plaintiff cleared his throat as if he were going to spit at Farmer—the action that Farmer said prompted him to push Plaintiff's head up and away and place Plaintiff on the ground by the neck. (Doc. 66-6 at 1, 12). Plaintiff denies he did anything like that. (Doc. 67 at 3) (citing Doc. 66-6 at 26). Notably, the other witnesses present did not attest to hearing Plaintiff clear his throat or seeing him try to spit on Farmer. (Doc. 66-6 at 2, 3, 33, 20, 64). And the video evidence does not show what occurred while Plaintiff was handcuffed and facing the wall—only that Farmer took Plaintiff down with his hand on Plaintiff's throat. (Doc. 69, Video of 7-7-2021 Use of Force at 10:31–10:32). Because of these outstanding

14

questions, a jury should determine whether the quantity and quality of force used were necessary. *See Alspaugh*, 643 F.3d at 168–69 (finding genuine issue of material fact as to whether prison officials applied force maliciously and sadistically to cause harm where plaintiff disputed any force was necessary because he was on the floor and not resisting). Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could determine that Farmer demonstrated a malicious or sadistic intent to cause harm by forcing a handcuffed prisoner, who was being held against a wall, to the ground via a choke slam.

Regarding the objective component, a reasonable jury could find the use of force was more than *de minimis*. Plaintiff suffered a .1 millimeter cut and swelling on his lip from this encounter. (Doc. 66-6 at 66). The fact that Plaintiff did not suffer a serious injury "goes a long way to disprove any claim that an officer used force with the required intent to harm." *Sootsman*, 79 F.4th at 619 (citation omitted); *see Peterson*, 2011 WL 1627924, at *6; *Bullocks*, 478 F. Supp. 3d at 648. But case law is clear that a relatively insignificant injury alone is not dispositive if a "prison official[] maliciously and sadistically use[s] force to cause harm" when using more than *de minimis* force because "contemporary standards of decency are always violated." *Hudson*, 503 U.S. at 9–10; *see Williams*, 631 F.3d at 383–384 (finding a *de minimis* injury alone was insufficient to dismiss an excessive force claim when a prisoner experienced coughing and a shortage of oxygen after being subjected to a chemical agent by prison officers). Rather, the "judicial inquiry should focus on 'the nature of the force'" applied. *Williams*, 631 F.3d at 384 (citing *Wilkins v. Gaddy*, 559 U.S. 34, 34, 130 S. Ct. 1175, 1177 (2010)); *see Hardy v. Vieta*, 174 F. App'x 923, 926–27 (6th Cir. 2006) (reversing a district court's grant of summary judgment based on a prisoner having no recorded objective injuries because, though the extent of a prisoner's injuries were not known, the record reflected an officer slammed a door on him and left the cell block laughing).

Again, this raises a question of credibility.  For certain, the nature of force Farmer used violated institutional policy, although this alone does not mean that Farmer violated Plaintiff's civil rights.  *See Sootsman*, 79 F.4th at 622 (finding that a deputy violating a jail's use of force policy does not substantiate an otherwise nonviable excessive force claim brought by a prisoner because the sheriff's department can "hold its officers to a higher standard than required by the Constitution[.]") (citing *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992)).  But if a jury believes Plaintiff's version of events, it could find that the nature of the force Farmer used was too much.  And what's more, the video evidence does not provide a full picture of the nature of the force used.  The video does not show what happened immediately after Plaintiff landed on the ground.  From the footage, it is impossible to know if Farmer applied any additional force, how long Farmer's hand was on Plaintiff's throat, or how much pressure Farmer applied to Plaintiff's throat during or after the choke slam.  (*See* Doc. 69, Video of 7-7-2021 Use of Force at 10:31:40–10:33:40).  These are all questions that go to the nature of the force that Farmer applied.  A reasonable jury could determine that the pain inflicted on Plaintiff was sufficiently serious to violate his civil rights.

All things told, the claim hinges on a credibility determination that is best reserved for a jury.  Were a reasonable jury to believe Plaintiff, it could find that Farmer's use of force was employed maliciously or sadistically with the intent to harm.  The jury could also find that the pain Plaintiff suffered was sufficiently serious.  Consequently, the Undersigned **RECOMMENDS** that Defendants' Motion for summary judgment for this claim be **DENIED**.

## 2.    Eighth Amendment – Deprivation of Meals

Construing Plaintiff's complaint liberally, Plaintiff claims that Defendant Raypool unconstitutionally deprived him of two meals.  (Doc. 3-1 at 2–3).  Defendants argue that Plaintiff had the opportunity to attend a meal in each case, per prison policy, but his misconduct caused him to be returned to his cell.  (Doc. 66 at 12–13).  Defendants provide records that show, in both cases:  Plaintiff was "creating a disturbance" or "being disruptive" while going to the dining room; Plaintiff was warned that his behavior must stop; and, when it did not, Plaintiff was returned to his cell.  (*Id.*)*.*  Defendants argue that Plaintiff does "not have a constitutional right to be free from repercussions when displaying disruptive behavior."  (*Id*. at 13).

As part of the Eighth Amendment protections against unnecessary and wanton inflictions of pain, prison officials cannot deprive an incarcerated person in a way that denies them "the minimum civilized measure of life's necessities."  *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399 (1981).  "The Eighth Amendment is concerned only with 'deprivations of essential food, medical care, or sanitation' or 'other conditions intolerable for prison confinement.'"  *Richmond v. Settles*, 450 F. App'x 448, 454 (6th Cir. 2011) (quoting *Rhodes*, 452 U.S. at 348, 101 S.Ct. 2392, 2400).  Like an excessive force claim, a conditions of confinement claim must meet objective and subjective components.  The objective component asks if the plaintiff has shown that the deprivation was so serious that it "den[ies] him the minimal civilized measure of life's necessities."  *Rhodes*, 452 U.S. at 347, 101 S.Ct. 2392, 2399.  The subjective component asks if the plaintiff has shown the prison official "acted wantonly, with deliberate indifference to the plaintiff's serious needs."  *Richmond*, 450 F. App'x at 455 (citations omitted).

Being deprived two meals over the course of two days does not rise to the level of being denied life's necessities.  "[W]ithholding of meals, while it may result in some discomfort to the

17

prisoner, does not result in a health risk to the prisoner sufficient to qualify it as a 'wanton infliction of pain' where the prisoner continues to receive adequate nutrition." *Richmond*, 450 F. App'x at 456 (finding that the deprivation of seven meals over the course of six days was not an Eighth Amendment violation); *see also Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982) (affirming the district court's finding that a prisoner's constitutional rights were not violated when he was served one meal a day over fifteen days when the meal had sufficient caloric content that the prisoner could maintain normal health). Notably, Plaintiff does not allege any ill health effects from the deprivation of the two meals. Thus, Plaintiff has not demonstrated the objective component of an Eighth Amendment conditions of confinement claim.

More still, Plaintiff acknowledges in his complaint that he was talking or singing as he was lining up to go to the dining room. (Doc. 3-1 at 2–3). Evidence in the record shows that these disruptions were the reason that Plaintiff was sent back to his cell without a meal, not because Defendant Raypool was acting wantonly or with deliberate indifference to Plaintiff's needs. (Doc. 66 at 12–13).

Under these circumstances, the Undersigned finds that no rational trier of fact could conclude that Plaintiff suffered a deprivation that rises to the level of an Eighth Amendment conditions of confinement claim. Defendant Raypool, therefore, is entitled to summary judgment as to this claim.

### 3. Eighth Amendment – Deliberate Indifference and Failure to Protect

Construed liberally, Plaintiff's complaint also alleges a deliberate indifference and failure to protect claim. (Doc. 3 at 3). Defendants argue that they should be granted summary judgment on this claim because Plaintiff does not specifically allege which Defendant is responsible for the alleged claim. (Doc. 66 at 33–34).

18

The Eighth Amendment requires that prison officials "take reasonable measures to guarantee the safety of its inmates." *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  A claim for failure to take such reasonable measures requires a showing that a prison official acted with "deliberate indifference" to a substantial risk of harm.  *Id.* (quoting *Farmer*, 511 U.S. at 834).  This has both an objective and subjective component.  *Id.*  The objective component for a claim based on the failure to prevent harm requires that the inmate "show that he is incarcerated under conditions posing a substantial risk of serious harm."  *Id.* (quoting *Farmer*, 511 U.S. at 834).  And the subjective component requires that the prison official had "a sufficiently culpable state of mind."  *Id.* (quoting *Farmer*, 511 U.S. at 834).  This means that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* (quoting *Farmer*, 511 U.S. at 837).

But "[t]o establish a claim upon which relief may be granted under § 1983 against a particular defendant a plaintiff must show that the defendant personally violated one of his rights." *Crisp v. Neel-Wilson*, No. 2:15-CV-1265, 2015 WL 5882126, at *2 (S.D. Ohio Oct. 7, 2015); *see Robertson v. Lucus*, 753 F.3d 606, 614 (6th Cir. 2014).  Further, "in § 1983 claims against a supervisory official, Plaintiff cannot rely on vicarious liability as a basis [for] the official's liability." *Crisp*, No. 2:15-CV-1265, 2015 WL 5882126, at *2.  Rather, "Plaintiff must 'show that [the] supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate' or otherwise that he was 'personally involved in the events leading to Plaintiffs claim.'" *Id*. (citing *Top Flight Entm't, Ltd. v. Schuette*,

19

729 F.3d 623, 634–35 (6th Cir. 2013) (quoting *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008))).

Here, it seems that Plaintiff brings this claim based on his allegations that he was receiving threats of future bodily harm from various prison staff members, including Defendant Farmer. (*See* Doc. 3-1 at 6). Even treating the threats as a substantial risk of serious harm, it is unclear which Defendant Plaintiff brings this claim against. The only Defendant that Plaintiff mentions in proximity to the claim is Defendant Cool. Plaintiff's complaint says he "notified . . . acting Warden William Cool" about "all these events using the inmate informal complaint system[,]" but only expressly asserts that a non-defendant "continues to [show] his indifference" to those complaints. (Doc. 3-1 at 7).

Even assuming Cool is the subject of this claim, Plaintiff has failed to create a genuine issue of material fact. Plaintiff does not allege any facts that suggest Cool was notified of his informal complaints or was personally involved in the informal grievance process in any way. Attached to his complaint, Plaintiff provides records of his interactions with various staff as part of the grievance process – none of the staff members are Cool. (*See* Doc. 3-1). Even when Plaintiff attempted to submit grievances against Cool personally, Plaintiff appears to have taken the incorrect procedural steps to do so, and, as such, his complaints were denied. (*See e.g.*, Doc. 3-1 at 49, 56). And formal institutional investigations into incidents involving Plaintiff that Cool reviewed allowed Plaintiff to present his side of the story. (*See e.g.*, Doc. 66-4 at 1–3). Even if Cool did not agree with Plaintiff in these reviews, Plaintiff does not allege facts that he implicitly authorized, approved or knowingly acquiesced to any threats of violence or harm of Plaintiff. Simply put, there are no allegations in the record showing that Defendant Cool had a sufficiently culpable mind and disregarded an excessive risk to Plaintiff's safety.

Under these circumstances, the Undersigned finds that no rational trier of fact could conclude that any Defendant acted with "deliberate indifference" to a substantial risk of harm to Plaintiff. Defendants therefore are entitled to summary judgment as to these claims.

### 4.    First Amendment Retaliation

Construing Plaintiff's complaint liberally, he seems to bring a First Amendment retaliation claim based on a handful of interactions with prison staff. (Doc. 3 at 3; *see* Doc. 3-1 at 5–7). Defendants argue that the Court should grant summary judgment in their favor on Plaintiff's First Amendment claim because Plaintiff has failed to present sufficient evidence of retaliation. (Doc. 66 at 32; *see* Doc. 3 at 3). Here, it is again unclear against which Defendant Plaintiff brings the claim. Plaintiff seems to imply that non-defendants and Defendant Cool retaliated against him when he tried to write grievances or file complaints by "shut[ing] [them] down every time without taking a second look at the situation." (Doc. 3-1 at 7). Plaintiff also alleges that one non-defendant "threatened [him] about grievances," and another non-defendant kicked him out of an office where he was waiting to speak with a staff member about a complaint. (*Id.* at 5–6). Plaintiff says that he is "only going through most of this because I write informals." (*Id.* at 7).

Retaliation against a prisoner for exercising his constitutional rights violates the Constitution. *Harbin-Bey v. Rutter*, 420 F.3d 571, 579 (6th Cir. 2005) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). A retaliation claim has three elements: (1) the plaintiff engaged in protected conduct; (2) adverse action was taken against the plaintiff; and (3) the adverse action was at least partially motivated by the plaintiff's protected conduct. *Thaddeus-X*, 175 F.3d at 394. And Plaintiff's engagement in filing grievances is protected conduct. "Filing a non-frivolous grievance against prison personnel is protected conduct under the First Amendment." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (citing *Herron v.*

*Harrison*, 203 F.3d 410, 415 (6th Cir. 2000)); *Maben v. Thelen*, 887 F.3d 252, 264 (6th Cir. 2018) ("An inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf.") (quoting *Herron*, 203 F.3d at 415) (internal quotation marks omitted); *see also Stephenson v. Black*, 887 F.2d 1088 Table (6th Cir. 1989) ("Although [plaintiff] has no protected interest in placement in a particular institution, he does have a protected right to complain about the conditions of the jail.").

Here, however, Plaintiff has not demonstrated that a genuine dispute of material fact exists as to whether any defendant took an adverse action against him motivated by his protected conduct. Plaintiff alleges that non-defendant prison staff and possibly Defendant Cool shut down his grievances without looking at them. But Plaintiff also submitted records of his communications with prison staff about his grievances that detail how the staff members investigated or addressed Plaintiff's grievances. (*See e.g.*, Doc 3-1 at 25). At times, Plaintiff was informed that he was not utilizing the grievance process correctly and was directed to file his complaint in a different way, but Plaintiff's grievances were not closed without a provided reason. (*See e.g.*, Doc. 3-1 at 49). It also does not appear that any of these interactions were with Cool directly. And the other alleged incidents of retaliation involve non-defendants.

Under these circumstances, the Undersigned finds that no rational trier of fact could conclude that Plaintiff's First Amendment rights were violated, and Defendants are entitled to summary judgment on Plaintiff's retaliation claims.

### 5.      Immunity

Plaintiff brought his complaint against Defendants in both their individual and official capacities. (Doc. 3 at 2–3). But Plaintiff seeks relief in the form of money damages. (*Id.* at 5). Absent an express waiver, a state is immune from damage suits under the Eleventh Amendment.

*P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139 (1993); *Edelman v. Jordan*, 415 U.S. 651 (1974).  The State of Ohio has not constitutionally nor statutorily waived its Eleventh Amendment immunity in the federal courts.  *See Johns v. Supreme Court of Ohio*, 753 F.2d 524 (6th Cir. 1985); *State of Ohio v. Madeline Marie Nursing Homes*, 694 F.2d 449 (6th Cir. 1982). The Eleventh Amendment bar extends to actions where the state is not a named party, but where the action is essentially one for the recovery of money from the state.  *Edelman*, 415 U.S. at 663; *Ford Motor Company v. Dept. of Treasury*, 323 U.S. 459, 464 (1945).  A suit against Defendants in their official capacities would, in reality, be a way of pleading the action against the entity of which Defendants are agents.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  Thus, actions against state officials in their official capacities are included in this bar.  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 70–71 (1989); *Scheuer v. Rhodes*, 416 U.S. 232 (1974).  *See also Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010) (citing *Cady v. Arenac Co.*, 574 F.3d 334, 344 (6th Cir. 2009) ("[A]n official-capacity suit against a state official is deemed to be a suit against the state and is thus barred by the Eleventh Amendment, absent a waiver." (citation and ellipsis omitted)).  Therefore, Defendants are immune from suit in their official capacities to the extent that Plaintiff seeks monetary damages.

Additionally, Defendants say they are entitled to qualified immunity for Plaintiff's claims against them in their individual capacities.  (Doc. 66 at 27).  "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."  *Taylor v. Riojas*, 592 U.S. ——, 141 S.Ct. 52, 53, 208 L.Ed.2d 164 (2020).  "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d

23

Case: 2:21-cv-05146-ALM-KAJ Doc #: 76 Filed: 11/20/23 Page: 24 of 25 PAGEID #: 1074

589 (1991) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "The contours of the [violated] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Since the Defendants have raised the qualified immunity defense, Plaintiff bears the burden of showing that Defendants are not entitled to qualified immunity. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (quoting *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012)).

Qualified immunity shields an officer from suit when her behavior was not constitutionally violative or "she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Taylor*, 141 S. Ct. at 53 (quotation omitted). As described above, no constitutional violation has occurred related to most Defendants, so qualified immunity is proper here for Defendants Raypool, Osbourne, and Cool.

But there is a genuine issue of material fact as to whether Defendant Farmer's actions constituted excessive force in violation of the Eighth Amendment. And, as described above, there is sufficient caselaw surrounding choking or assaulting restrained plaintiffs to put Farmer on notice that the force alleged violated the Eighth Amendment. *See Alspaugh*, 643 F.3d at 168–69; *Briggs*, 2017 WL 2174252, at *3. Until a jury resolves those factual disputes, Defendant Farmer is not entitled to qualified immunity.

Accordingly, the Undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment (Doc. 66) be **GRANTED in part and DENIED in part**. Plaintiff's Eighth Amendment excessive force claim against Defendant Farmer in his individual capacity may proceed.

24

## IV.     CONCLUSION

For the foregoing reasons, the Undersigned **RECOMMENDS** Plaintiff's Motion for Summary Judgment (Doc. 54) be **DENIED** and **RECOMMENDS** Defendants' Motion for Summary Judgment (Doc. 66) be **GRANTED in part and DENIED in part**.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a *de novo* determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence, or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: November 20, 2023                    /s/ Kimberly A. Jolson
                                           KIMBERLY A. JOLSON
                                           UNITED STATES MAGISTRATE JUDGE